## ROMINE *v.* THAYER ET AL.

[No. 10,423. Filed October 13, 1920. Rehearing denied December 22, 1920.]

1. FRAUD.—*Elements.—Knowledge that Representations Are False.*—A seller of corporate stock who, without actual knowledge of the corporation's financial condition, states as a fact that the stock is gilt edge and worth par, when that is not the fact, is liable for fraud to a buyer who relies upon such statement as true, and is thereby induced to buy, even though the seller believed the statement to be true. p. 542.

2. PRINCIPAL AND AGENT.—*False Statement of Agent.—Liability of Principal.*—A principal is liable for the false statements of his agent within the scope of his employment, even though the statements were made without the knowledge and consent of the principal. p. 543.

3. FRAUD.—*False Representations as to Value of Corporate Stock.—Duty to Investigate.*—In an action for fraud in the sale of stock in a mercantile corporation insolvent at the time of sale, where buyer was without experience in such business, and whose only opportunity for investigation of the company's affairs was on the occasion of a brief visit to its store, at which time the company's financial condition was not discussed, nor its books shown to him, *held* that the buyer had a right to rely on the seller's representations as to value of stock, etc. p. 544.

4. APPEAL.—*Questions Presented.—Admission of Evidence.*—In the absence of proper objection to the admission of evidence, no question thereon is presented for review on ·appeal. p. 545.

5. EVIDENCE.—*Competency.—Cross-examination.—Question Calling for Conclusion.*—In an action for fraud in a trade of cor-

porate stock for land, in which plaintiff claimed that the deal was hurried through, an objection was properly sustained, on cross-examination of one of the defendants, to a question, "So that deal was made in a hurry there, without any examination of the abstract of title, was it?" since the question was not in proper form, although the facts sought to be elicited were competent upon the question whether the deal was closed hurriedly.    p. 545.

6. WITNESSES.—Repetition of Question Previously Answered.— It is not error to sustain an objection to a question which a witness has previously been asked and answered.    p. 545.

7. APPEAL.—Review.—Refusal of Instructions.—Invading Province of Jury.—In an action for fraud in the sale of stock in a corporation insolvent at the time of sale, an instruction that corporate stocks might have considerable value even if the corporation is heavily in debt or is insolvent under the laws of the state in which it is located, was erroneous as invading the province of the jury, since it assumed a fact as to the value of the specific stock involved, which question was for the jury.    p. 546.

From Hamilton Circuit Court; Ernest E. Cloe, Judge.

Action by Clark W. Romine against Lee C. Thayer, Sr., and others. From a judgment for defendants, the plaintiff appeals. Reversed.

Frank S. Roby, Harding W. Hovey, Charles H. Cook, Thomas E. Kane, Alfred R. Hovey and Jonas P. Walker, for appellant.

Arthur C. Van Duyn, A. J. Shelby, Gentry & Campbell and Charles L. Tindall, for appellees.

NICHOLS, J.—This action was by appellant against appellees for damages suffered by him resulting from alleged fraudulent representations made to him by appellees concerning the value of certain corporate stock of a mercantile corporation, known as the Spot Cash Cooperative Store Company, which they undertook to trade, and did trade, to appellant in exchange for his farm. It is averred in the complaint that on and prior to September 12, 1911, appellees, to induce appellant to

trade his farm to them for stock in said company, represented that said company owned a stock of merchandise in its store building in Greenfield, Indiana, worth at least $35,000; that it was backed up by $65,000 in cash; that its property amounted to $100,000; that its property holdings were sufficient to make its corporate stock worth par or more than par; that it owed no debts of any kind whatsoever; that it bought its merchandise for cash, and sold it for cash, and discounted all its bills; that it was doing a large and profitable business; that its discounts from paying cash were sufficient to pay for all clerical help in its store.  Appellant was ignorant of the facts, and believed and relied upon the appellees' representations, as they intended that he should, and, so relying, transferred and conveyed his equity in his farm, which was subject to a $5,500 mortgage, for $6,000 par value of the stock of said company, which was to pay seven per cent. per annum, with other considerations not here involved.  It is averred that the representations of appellees were false at the time they were made, and were fraudulently made for the purpose of deceiving and defrauding appellant, and inducing him to exchange his real estate for said corporate stock; that said company did not then own a stock of merchandise of the value of $35,000, but that it had been greatly depleted by rush sales, and was not worth over $20,000; that it did not have more than $500 on hand and on deposit, and was not out of debt, and was not buying merchandise for cash for sale in its store, but on said September 12, 1911, the date of such representations and deal, had gone in debt for a large amount of merchandise, both original and for replenishing, and that it was purchasing on credit, and not discounting its bills; that it was largely in debt, and in an insolvent condition.  In 1913 the company was adjudged a bankrupt in the United States District Court for Indiana, and

appellant's stock was worthless. There was a prayer for $7,500 damages.

The case was put at issue by denials, and submitted to a jury, which returned a verdict for appellees. After a motion for a new trial, which was overruled, judgment was rendered on the verdict for appellees, from which this appeal. The errors assigned are the court's action in overruling the motion for a new trial. The motion challenges the sufficiency of the evidence, the admissibility of certain evidence, and the giving of certain instructions.

It appears by the evidence that appellant lived upon a farm when a boy. When grown, he became a railroad man, working first as a section hand on the Pennsylvania Railroad, then as a brakeman and conductor for the Erie Railroad Company, and later twenty-two years for the Big Four Railroad Company, at the end of which time, in the fall of 1911, he moved to the farm involved. He had never had any experience in corporate stocks, or in handling merchandise, and was not acquainted with such values.

On June 3, 1910, and for many years prior thereto, Lee C. Thayer Company had conducted a general merchandising store in Greenfield, Indiana; and in said company, appellee Lee C. Thayer, Sr., was the principal stockholder, he and his son owning all of the stock. At about said time they sold to the Spot Cash Co-operative Store Company, then being incorporated with $40,000 common and $35,000 preferred stock, all the stock and merchandise and fixtures in the store then belonging to them for a consideration in the amount at which said stock of merchandise and fixtures should inventory. That $15,000 of said consideration payable to the Thayers should be paid for with $15,000 face value of the preferred stock of the said Spot Cash company, and the difference between said amount of $15,000 and

the amount at which said stock of merchandise and the fixtures would inventory, should be paid to the Thayers in cash derived from sales of merchandise out of the stock of the new store. The new company was to rent its storerooms from Thayers. Thayers were to have a representative in said store to care for their interest until they had received the entire consideration aforesaid. The common stock was issued to the promoters, who paid nothing therefor. The stock of goods named in such contract inventoried at $33,230.45 so that the Spot Cash company became indebted to the Thayers therefor in the sum of $18,230.45 over and above the amount of $15,000 paid in preferred stock, as aforesaid. The Spot Cash company then proceeded to conduct a series of rush sales, selling goods out of its merchandise stock at a sacrifice in order to meet its obligations to Thayers. Thayers had a representative in the store, who saw that they received their money and who kept them apprised of the affairs and financial condition of the new company, by keeping, for their benefit, a set of duplicate books showing the receipts and expenditures and indebtedness of the Spot Cash company. New goods were bought on credit to help offset the inroads which were made on the original stock of the Spot Cash store by the rush sales, and records of such purchases were recorded in the duplicate books kept for Thayers as well as in the company's regular books.

In the summer of 1911 appellee Thayer employed appellee Crider as his agent to negotiate a deal for appellant's farm in which some of said stock of appellee Thayer could be worked in.

Appellant's farm was a desirable one of about sixty acres, advantageously situated just east of and adjoining the corporation line of Fortville and running up to the rights of way of the Big Four Railway and a certain interurban line. The residence on the farm was

only about four or five blocks east of the railway station at Fortville, and there was an interurban stop at the street crossing on the west line of said farm.

Appellee Crider, immediately upon his employment as such agent as aforesaid, went to the Romine farm to see the Romines in regard to the trade, and urged appellant to trade his farm for a consideration partly of shares of said stock. He represented that said stock was gilt-edge, worth a hundred cents on the dollar, was paying seven per cent. dividends, would sell for more than par, was backed up by a company worth $100,000, having $35,000 in merchandising stock and $65,000 in the bank, and was out of debt; that said company bought and sold altogether for cash saving enough on discounts in this way to pay practically all the help used in the store. Appellant had at that time refused to trade for any of the stock. Appellee Crider paid Romine a second visit a short time after his first one, and made to him practically the same representations as before with regard to the said stock.

On September 12, 1911, appellees Thayer and Crider looked up Mr. Romine at a public sale he was attending, accompanied him to his home, and renewed the proposition of the trade. Appellee Thayer told appellant that said stock was gilt-edge, and was present at a conversation at the Romine house in which appellee Crider made the same representations to the Romines with regard to the stock that he had made on the occasions of his former visits. Appellee joined into the conversation to tell the Romines that he could not afford to misrepresent things to them.

Appellant, relying upon the said representations made to him, decided to trade, and it was agreed then and there that appellee Thayer was to assume an incumbrance against the farm of $5,500 and interest thereon, pay Mr. Romine $1,206 in cash, and transfer to him

$6,000 face value of the stock. Upon the insistence of appellees, and their representations of reasons for closing the deal at once, the Romines agreed to go down to Greenfield with them that same afternoon, where they arrived at four o'clock p.m., and the trade was consummated. There is some contradiction as to the investigation that appellant made, but it does not appear that any was made except in the presence of appellee Crider, or that he received any information as to the representations involved. Mr. Thayer had directed that the farm be deeded to Sherman Helbert, and Mrs. Romine, who held the title to said farm in trust for her husband, so deeded it at Mr. Romine's direction.

It is uncontroverted that the Spot Cash Co-operative Company did not buy and sell for cash only. It bought on credit; bought its original stock of goods from the Thayers on credit; paid a cash indebtedness of $18,000 owing by it to Thayers with the proceeds derived from rush sales at which they sold goods out of their original stock, and replenished said original stock of goods after the inroads so made upon it with new goods which they bought on credit at all times throughout its existence; that at the time of the trade with appellant the Spot Cash company was deeply in debt; that it did not have $65,000 in cash, as represented, but had only $803.38; was not worth $100,000; was almost $2,000 farther in debt than it was in the spring of 1913, when it became bankrupt; and the $6,000 of stock which was the chief consideration for appellant's farm proved to be worthless.

Appellee Thayer had a duplicate set of the books of the company at his command, and is charged with full knowledge of the financial condition of the company as above set forth, but, even if he did not have actual knowledge of the condition, yet, stating as a fact that the stock was gilt-edge, meaning

1.

thereby that it was worth 100 cents on the dollar, when such was not the fact, he was thereby liable to appellant for the fraud if appellant relied upon such statement as true and was induced thereby to trade; and this is the law, even though said appellee believed the statement to be true when he made it. *Kirkpatrick* v. *Reeves* (1889), 121 Ind. 280, 22 N. E. 139; *Wheatcraft* v. *Myers* (1914), 57 Ind. App. 371, 377, 107 N. E. 81; *New* v. *Jackson* (1912), 50 Ind. App. 120, 95 N. E. 328; *Culley* v. *Jones* (1905), 164 Ind. 168, 73 N. E. 94. If, instead of such representations, appellant had been candidly informed of the financial condition of the company, or if he had discovered it by reason of some reasonable opportunity given him to investigate as to such condition, it will hardly be contended that, in the face of such knowledge, he would have sacrificed what we assume represented his years of toil as a railroad laborer.

It is undisputed that appellee Crider was the agent of appellee Thayer for the purpose of consummating the deal involved, and that he received $200 for his services. While acting as such agent, he not only represented that the stock was gilt-edge, but he gave the grounds upon which he based the statement, which are set out above, and all of which were false. Some of the statements which he made were in the presence of his principal. The principal is responsible for these false statements; and this is the law, even if they were made without the knowledge and consent of the principal. *Wolfe* v. *Pugh* (1885), 101 Ind. 293; *O. M. Cockrum Co.* v. *Klein* (1905), 165 Ind. 627, 632, 74 N. E. 529; *Larue* v. *American, etc., Engine Co.* (1911), 176 Ind. 609, 96 N. E. 772; *Firebaugh* v. *Trough* (1914), 57 Ind. App. 421, 107 N. E. 301; *Stockton, etc., Works* v. *Glens Falls Ins. Co.* (1893), 98 Cal. 576, 33 N. E. 633.

Appellees contend that, appellant having made an in-

vestigation of his own, and nothing hindering him from making as full investigation as he chose to make, 3. he cannot now complain of misrepresentations.

But appellant did not make an investigation of his own of anything that would in any way disabuse his mind of the misrepresentations that had been made to him, which fact appellees well knew, and therefore had to know that he relied upon their representations as to the matters herein involved. He arrived in Greenfield, in which town he had never been before, about four o'clock, and, in company with appellee Crider, had a short talk with a banker who gave him no information whatever regarding the indebtedness of the company. Thereafter, in company with appellee Crider, he visited the store, where he was introduced to the manager, who informed him that appellant was thinking of trading for some stock and wanted to look over the store. The manager talked with him some, and remarked, "you can see what we are doing.". It does not appear that anything was said about the financial condition of the company, or that books of the company were shown to him, and, if they had been, not being expert in such matters, the hasty examination he could have given under such circumstances would have revealed nothing to him. The investigation was made and the deal closed after four o'clock. To hold that appellant is presumed to rely on such an investigation as he made rather than on the representations that were made to him would indeed be a violent presumption. He had a clear right to rely upon the representations. *Valdenaire* v. *Henry* (1919), 70 Ind. App. 68, 121 N. E. 550; *Rohrof* v. *Schulte* (1900), 154 Ind. 183, 55 N. E. 427; *Beck* v. *Goar* (1913), 180 Ind. 81, 100 N. E. 1; *Culley* v. *Jones, supra; Judy* v. *Jester* (1913), 53 Ind. App. 74, 100 N. E. 15; *Tooker* v. *Alston* (1907), 159 Fed. 599, 16 L. R. A. (N. S.) 818.

Appellant complains of the court's action in admitting certain evidence, but it seems that no proper objection was made or exception saved, and the question is therefore not before us. Appellant propounded to appellee Crider, as a witness, the following question on cross-examination: "So that deal was made in a hurry there, without any examination of the abstract of title, was it?" The court sustained appellee's objection to this question. This was not reversible error. The question might well have been put in such form as to develop the facts upon which the jury might reach a conclusion as to whether the deal was closed hurriedly. Such facts properly presented were competent. Appellant complains that the court sustained objection to the following question: "Did you ask him whether or not he had ascertained the financial condition of the company before he traded?" The question was answered "No sir," after which the objection was sustained, but the answer was not stricken out. The same question had been previously asked and answered. There was no reversible error. Instruction No. 2, requested by appellees and given by the court, is based upon the assumption that appellant had made an investigation upon which he might have relied instead of upon the representations which were made to him. But there is no evidence that appellant made any investigation as to the indebtedness of the company, or as to whether it was doing a spot cash or a credit business, or as to the amount of money then on hand, and these were the substantial fraudulent representations that were made. It was error to give this instruction. For the same reasons, instruction No. 10 should not have been given.

Instruction No. 4 involved the question of the duty of appellant to investigate, and his right to rely upon rep-

resentations made to him. We have sufficiently considered these questions in our discussion of the insufficiency of the evidence. The instruction as applied to the facts in this case was erroneous.

Instruction No. 5 contains the following statement: "Corporate stocks may have considerable value even if the corporation is heavily in debt or is insolvent under the laws of the state in which it is located."

The statement assumes a fact as to corporations generally, while the question in this case was as to the value of the specific stock involved, and this question was for the jury. The court by its statement clearly invaded the province of the jury. It was error to give instruction No. 5 with this statement included in it.

We have disposed of such questions as are likely to arise in another trial. The judgment is reversed, with instructions to the trial court to grant a new trial.